# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RON HUPPERT; JAVIER SALGADO,
    *Plaintiffs-Appellants,*

v.

CITY OF PITTSBURG; AARON BAKER;
WILLIAM ZBACNIK; MICHAEL
BARBANICA; WILLIAM BRIAN
ADDINGTON; WAYNE DERBY,
    *Defendants-Appellees.*

No. 06-17362

D.C. No.
CV-05-01433-JL

RON HUPPERT; JAVIER SALGADO,
    *Plaintiffs-Appellants,*

v.

CITY OF PITTSBURG; AARON BAKER;
WILLIAM ZBACNIK; MICHAEL
BARBANICA; WILLIAM BRIAN
ADDINGTON; WAYNE DERBY,
    *Defendants-Appellees.*

No. 07-16600

D.C. No.
CV-05-01433-JL

OPINION

Appeal from the United States District Court
for the Northern District of California
James Larson, Magistrate Judge, Presiding

Argued and Submitted
July 18, 2008—San Francisco, California

Filed July 21, 2009

9317

Before: William A. Fletcher and Richard C. Tallman,
Circuit Judges, and William O. Bertelsman,* District Judge.

Opinion by Judge Tallman;
Dissent by Judge William A. Fletcher

---

*The Honorable William O. Bertelsman, Senior United States District
Judge for the Eastern District of Kentucky, sitting by designation.

**COUNSEL**

Russell A. Robinson, San Francisco, California, for the appellants.

Joseph M. Quinn, MEYERS NAVE RIBACK SILVER & WILSON, San Francisco, California, for the appellees.

**OPINION**

TALLMAN, Circuit Judge:

We examine the question whether a state police officer's speech, in different forms, is protected under the First

Amendment from retaliatory actions taken by that officer's superiors. Plaintiffs Ron Huppert and Javier Salgado appeal the district court's grant of summary judgment in favor of the Appellees, the City of Pittsburg and individual police officers within the Pittsburg Police Department ("PPD"), dismissing their claims under 42 U.S.C. § 1983.

We hold that the speech at issue was given pursuant to Huppert and Salgado's job duties, and therefore affirm the district court's grant of summary judgment. Additionally, Salgado appeals the district court's dismissal on summary judgment of his § 1983 claim brought under the Fourth, Sixth, and Fourteenth Amendments. We affirm the district court on this claim as well. Finally, both Huppert and Salgado appeal the district court's grant of costs to the Appellees solely on the ground that the Appellees failed to timely file their bill of costs. This argument is meritless, so we also affirm the district court's award of fees.

**I**

Huppert joined the PPD on January 25, 1991, where he worked primarily as a patrol officer and an inspector. In 1995, he was assigned to work a twenty-four hour shift at the Pittsburg Seafood Festival. He requested a shift modification, which was subsequently denied by the PPD. He consulted with a labor attorney, who, unbeknownst to Huppert, contacted the PPD. After Huppert returned to work, Lieutenant Aaron Baker ("Baker")—who is now Chief of Police for the PPD—expressed unhappiness with Huppert and asked Huppert to sign a letter in which he acknowledged (non-existent) sick-leave abuse. When Huppert refused to sign the letter and requested review of all his "sick-leave slips," the matter was "apparently dropped."

In 1996, after being promoted to Inspector, Huppert was assigned to investigate a vehicular manslaughter case. He reported that one of his supervisors, Sergeant Keeler

("Keeler"), a personal friend of Baker, had pursued a carjacking suspect, reaching speeds of up to 100 m.p.h. without using his emergency lights or siren. An innocent third party perished in the resulting crash. In his report about the incident, Huppert discussed his "concerns about Keeler's conduct during the pursuit," and Keeler's use of racial slurs. Now a Commander, Baker charged Huppert with "failure to report and subversive conduct" for not having previously reported this misconduct—which Baker referred to as a "letter of advisement." The charge was later reduced to a "warning."

Between 1997 and 1998, while still employed as a Pittsburg police officer, Huppert was selected by the Contra Costa County District Attorney's Office to assist in investigating corruption at the Pittsburg Public Works Yard. Huppert states that "[f]rom that time on, my superiors [at the PPD] treated me with scorn and as an outcast." Then, in 1998 Huppert took the sergeant's exam. He finished first on the written section of the exam, and during the oral portion of the exam, he was questioned "mostly" about his goatee. The following day Baker informed him that he would not be promoted because he had decided to keep his goatee.

Sometime prior to 2001, Huppert began working with the FBI on an investigation into suspected corruption within the PPD. While he does not disclose what assistance he gave to the FBI, he does claim that this work was "outside [his] duties as a member of the PPD." Then, in January 2001, his superior, William Zbacnik, informed Huppert that he would be transferred to "Code Enforcement," also known as the "Strategic Operations Bureau." He was officially transferred in June 2001, and was sent to a building known within the PPD as the "Penal Colony," because "disaffected and/or disfavored officers were assigned there." Huppert's new supervisor, William Hendricks ("Hendricks"), informed him that he had been sent to the "Penal Colony" because Baker wanted Hendricks to find a way to fire him. Huppert's new office at the "Penal Colony" was a "tiny converted bathroom without computer

access," and even though he was assigned to investigate gang-related activity, the building was not equipped with the proper secured areas needed for his investigations. During the six-month period between January and June 2001, Huppert was not permitted to work overtime.

Salgado joined the force in 1995 and was, for the majority of his tenure, a detective. In September 2001, he was assigned to the "Strategic Operations Bureau" as Huppert's partner. Baker assigned both of them to investigate suspected corruption at the local City-owned golf course, but told them not to inform Hendricks of this assignment. The investigation "revealed improper conduct by members of the PPD, including gambling, accepting free golf, and possible illegal drug activity." After only two interviews, Baker commanded that Huppert and Salgado cease the investigation. Once they informed Hendricks, he encouraged them to continue investigating and informed Baker that Huppert and Salgado were still looking into corruption at the golf course. Hendricks also informed the FBI that he believed there was a major gambling operation on-going at the golf course.

Huppert claims that while Baker told them not to memorialize their findings, they drafted a report at the conclusion of their inquiry and directed it to Baker and the Pittsburg City Manager. The report "included a finding that defendant Zbacnik had accepted thousands of dollars in gratuities and other illegal perks." However, following the report, Baker took no action against Zbacnik, and instead deemed Zbacnik's actions a "training issue."

In 2002, Huppert and Salgado's office was moved from the "Penal Colony" back to the main Civic Center. They were not initially given an office, and when they finally received one, it was "an old storage room."

Huppert states that Hendricks was "forced out" in December of 2002, and Michael Barbanica ("Barbanica") took his

place. In January 2003, Barbanica and defendant William "Brian" Addington ("Addington") falsely accused Huppert and Salgado of engaging in an improper pursuit. Both Huppert and Salgado claim that they were in no way involved in the pursuit. Though Barbanica initially claimed that an "anonymous concerned citizen" had reported that Huppert and Salgado were involved, he later admitted that he had lied. He agreed that Zbacnik had been behind his false accusations.

It was normal practice at the PPD that when a supervisor was absent, the next senior officer was normally designated as acting unit supervisor. In late 2003 and early 2004, the practice was changed in the Code Enforcement Unit, where Huppert and Salgado were the next senior officers under their supervisor, Sergeant Reposa. Because of the change in practice, Huppert and Salgado were required to report to the Investigations Unit Supervisor, and were hence prevented from exercising any supervisory authority and earning out-of-class pay.

Salgado claims that in late 2003 and early 2004, Addington began an investigation of Officer Jim Hartley for allegedly falsifying reports. It was obvious to Salgado that "Addington disliked Hartley and was seeking to terminate him." Addington sought to have Salgado claim first-hand knowledge of events which Salgado had not actually witnessed, but Salgado refused to do so.

Huppert and Salgado allege that in February 2004, defendant Wayne Derby ("Derby") became their supervisor. Derby informed them that he was Chief Baker's " 'hatchet man' " and that Baker saw them as "malcontents." He subsequently took away their undercover vehicle and replaced it with an easily recognizable, though unmarked, Ford Taurus. They claim this hindered their work as gang detectives.

Huppert then states that in March 2004, he was subpoenaed to testify before a Contra Costa County grand jury that was

"probing corruption in the PPD." Other officers, including Baker, were also subpoenaed to testify, and the subpoenas were received at the PPD for delivery to the individual officers. Huppert's receipt of this subpoena was "recorded in a subpoena log posted in the [PPD] break room." Huppert states that Baker openly discussed his testimony, and told Huppert he knew Huppert had testified before the grand jury as well. Baker also identified officers who he thought would be "bad witnesses" for the department, which Huppert understood to indicate Baker's belief that they were "malcontents."

Sometime after his grand jury testimony, Derby informed Huppert that his position as a gang investigator was being eliminated and he was transferred to a position investigating fraud and forgeries. Addington became his supervisor, and he was assigned to investigate fraud claims, which Huppert claims are less desirable than "person crimes." After the transfer, Addington changed the way in which fraud cases were handled within the PPD, requiring Huppert to generate reports in order to close each case. Huppert believes this increase in workload was initiated simply as a method of harassment. Additionally, Addington would criticize the completed reports over minor mistakes, "such as the letter 'M' (for 'Male') being in the wrong font." Addington also refused to permit Huppert to wear a uniform shirt with an outdated embroidered badge when other officers were allowed to do so. He would call Huppert to come to his office claiming he had Huppert's "pink slip," but would then admit he was just "kidding." Finally, Addington attempted to replace Huppert's "superlative" yearly evaluation, originally conducted by Sergeant Stroup, with an evaluation completed by Addington. After Huppert and the Patrol Officers' Association filed a grievance against the PPD and Addington, Baker restored Stroup's original evaluation to Huppert's file. Huppert took a temporary disability leave in 2003, and then retired on disability in 2004.

In May 2004, Salgado was placed on administrative leave pending an investigation into whether he had falsified police

reports in Health and Safety Code section 11550 cases. While he admits that he did "cut and paste" when drafting his arrest reports, he claims this was "an accepted practice at the time in the PPD," and that he actually ensured that the proper individual results were accurately recorded. In fact, he insists this practice was "encouraged by [his] supervisors," and he had seen other officers using his prefabricated reports.

In July 2004, Salgado received a Notice of Proposed Disciplinary Action, which suggested his termination. Two days before Salgado's *Skelly*[1] hearing, a newspaper reporter notified him that Baker was planning to terminate him from the PPD and the District Attorney would institute a criminal prosecution against him. A newspaper article stating the same was published on the day of the hearing. On the advice of counsel, Salgado did not appear at the *Skelly* hearing, and Baker terminated his employment three days later. However, apparently Baker had a change of heart, and Salgado was reinstated.

Barbanica informed Salgado that if he were to resign, the criminal charges would be dropped. Salgado reviewed his personnel file and found that it had been purged of all positive references and performance reviews. Notably absent was his 2001 Officer of the Year award. Salgado refused to resign and was officially terminated on August 24, 2004.

Huppert and Salgado filed this civil rights action in the Northern District of California on April 7, 2005. The defendants moved for summary judgment, which the court granted on November 15, 2007.[2] The district court held, primarily under *Garcetti v. Ceballos*, 547 U.S. 410 (2006), that because each alleged incident of speech by either Huppert or Salgado was not made as a private citizen, the speech was not pro-

---

[1]*Skelly v. State Personnel Board*, 15 Cal. 3d 194, 215 (1975), grants notice and a right to be heard to all California public employees before imposing discipline.

[2]Judgment was entered on November 17, 2007.

tected from retaliation by the First Amendment. Hence, they had no claim under § 1983. It also granted summary judgment to the defendants on Salgado's claims and awarded costs to the defendants. Huppert and Salgado timely appealed.

## II

We review a district court's grant of summary judgment de novo. *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 896 (9th Cir. 2008). In determining whether summary judgment was appropriate, we view the evidence in the light most favorable to Huppert and Salgado, the non-moving parties. *Id.* A grant of summary judgment is inappropriate if there is "any genuine issue of material fact or the district court incorrectly applied the substantive law." *Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007).

On Huppert and Salgado's appeal regarding the award of costs, we review for clear error the district court's findings of fact with respect to the timeliness of the cost application. *Chevron USA Inc. v. Bronster*, 363 F.3d 846, 855 (9th Cir. 2004), *rev'd on other grounds sub nom.*, *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528 (2005). We review for abuse of discretion the district court's refusal to strike. *Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 723 (9th Cir. 2005).

## III

Three issues are before us on appeal. First, whether the district court improperly dismissed on summary judgment Huppert and Salgado's § 1983 claims for violations of the First Amendment. Second, whether the presiding judge also erred by granting summary judgment on Salgado's claim alleging violations of the Fourth, Sixth, and Fourteenth Amendments. Finally, whether the district court incorrectly awarded costs to the Appellees.

## A

**[1]** The Supreme Court has clearly stated that public employees do not shed their First Amendment rights simply because they are employed by the government. The First Amendment shields a public employee if he speaks as a citizen on a matter of public concern. *See, e.g.*, *Ceballos*, 547 U.S. at 417; *Rankin v. McPherson*, 483 U.S. 378, 384 (1987); *Connick v. Myers*, 461 U.S. 138, 142-143 (1983); *Pickering v. Bd. of Educ. of Twp. High School Dist. 205, Will Cty.*, 391 U.S. 563, 569-70 (1968). While this protection is applicable to such individuals, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Ceballos*, 547 U.S. at 421. "The problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

**[2]** Recently, in *Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009), we distilled the Supreme Court's prior holdings on this issue into "a sequential five-step" inquiry:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Id*. at 1070. We reaffirmed this test in *Robinson v. York*, 566 F.3d 817, 822 (9th Cir. 2009), where we again considered

whether the district court had improperly denied qualified immunity in a § 1983 retaliation case.

**[3]** Our sister circuits and the Supreme Court have said that the question whether the plaintiff acted pursuant to his or her job duties is antecedent to a determination whether the plaintiff spoke regarding a matter of public concern. *See, e.g.*, *Chaklos v. Stevens*, 560 F.3d 705, 711-12 (7th Cir. 2009) ("[*Ceballos*] requires a threshold determination regarding whether the public employee spoke in his capacity as a private citizen or as an employee."); *Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008) ("it is clear that [*Ceballos*] added a threshold layer to our previous analysis"); *Boyce v. Andrew*, 510 F.3d 1333, 1343 (11th Cir. 2007) (stating that it must decide "at the outset (1) if the government employee spoke as an employee or citizen . . ."); *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 545 (6th Cir. 2007) ("the threshold inquiry [is] whether the speech was, in fact, made pursuant to the employee's official duties"); *Williams v. Dallas Ind. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir. 2007) ("[t]he Supreme Court's recent pronouncement in *Garcetti v. Ceballos* added a threshold layer . . ."). While we also believe that this should be the threshold inquiry, we are bound by our precedent to follow the test set forth in *Eng*.

**[4]** Where applicable below, we will move through the sequential *Eng* factors. The first two prongs of this inquiry address whether the speech should be protected under the First Amendment, while the last three address whether that protected speech caused some retaliatory response. However, because these are sequential steps, as explained in *Eng*, failure to meet one necessarily concludes our inquiry.

Huppert and Salgado point to four incidents where they believe their protected speech led to retaliatory action by the Appellees: (1) Huppert's assistance to the Contra Costa County District Attorney's Office in 1997 and 1998 investigating corruption at the PPD; (2) Huppert and Salgado's

report and memoranda regarding their golf-course investigation; (3) Huppert's cooperation with the FBI in its investigation of corruption within the PPD; and (4) Huppert's testimony before the Contra Costa County grand jury investigating potential corruption within the PPD. We discuss each in turn.

**1**

Huppert's first claim of retaliation stems from his cooperation with the Contra Costa County District Attorney's Office in 1997 and 1998 during its investigation of the Public Works Department. He claims that during this time he was not working as a police officer, but instead as an assistant to the District Attorney. Then, after his superiors at the PPD discovered his involvement with the criminal investigation, he was "treated with scorn and as an outcast." Also as a result of this involvement, he claims that he was passed over for a promotion, transferred to the Penal Colony, and that his assistance led to additional acts of retaliation.[3] Though he provides no evidence that any speech occurred—i.e., he points to no record of a report, discussion with superiors, letters to politicians, etc.—we read the facts in his favor and assume that he engaged in some form of speech.

Under the *Eng* test, we first consider whether his investigation involved a matter of public concern. "[S]peech involves a matter of public concern when it fairly can be said to relate to 'any matter of political, social, or other concern to the community.' " *Gibson v. Office of Atty. Gen., State of Cal.*, 561

---

[3]The City counters that this claim is time-barred under the applicable statute of limitation. While Huppert's assistance to the District Attorney's office took place in 1997 and 1998, the claimed retaliatory actions occurred over a long period of time. Additionally, none of these alleged actions were discrete, *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110, 114 (2002), and instead indicate a potential continuing practice within the PPD, *id.* at 111-12. We therefore disregard the City's argument that the statute of limitation bars this portion of Huppert's claim.

F.3d 920, 925 (9th Cir. 2009) (quoting *Connick*, 461 U.S. at 146 (1983)). "Analysis of public concern is not an exact science." *Weeks v. Bayer*, 246 F.3d 1231, 1234 (9th Cir. 2001). "When the employee addresses issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government, that speech falls squarely within the boundaries of public concern." *Id.* (internal quotation marks and citations omitted). We have said that "[u]nlawful conduct by a government employee or illegal activity within a government agency is a matter of public concern." *Thomas v. City of Beaverton*, 379 F.3d 802, 809 (9th Cir. 2004). Furthermore, "misuse of public funds, wastefulness, and inefficiency in managing and operating government entities are matters of inherent public concern." *Johnson v. Multnomah County*, 48 F.3d 420, 425 (9th Cir. 1995). It is clear to us that an investigation into corruption and misconduct at the local Public Works Department —typically a municipal department created to provide multiple public services to community members—is a matter of public concern. *Cf. Robinson*, 566 F.3d at 823.

However, it is less apparent that Huppert meets the second prong of the *Eng* test. As explained in *Eng*, "the plaintiff bears the burden of showing the speech was spoken in the capacity of a private citizen and not a public employee." 552 F.3d at 1071 (citing *Ceballos*, 547 U.S. at 421-22). While the Supreme Court did not delineate a "comprehensive framework" for determining when speech is pursuant to an employee's job function, it provided guidance for lower courts to follow when making such a decision. *Ceballos*, 547 U.S. at 424.

**[5]** *Ceballos* said that speech which "owes its existence to an employee's professional responsibilities" is not protected by the First Amendment. *Id.* at 421. Additionally, if the public employee was paid for the speech—e.g., drafting a memorandum, creating a report, advising a supervisor—then that compensation might be indicative of the nature of the speech. *Id.*

at 422. An adverse employment action for this type of speech "does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421-22. Our inquiry should be practical and look beyond the job description to the duties the employee actually performs. *Id.* at 424. Speech which has "no official significance" and bears "similarities to [actions taken] by numerous citizens everyday" falls outside the ambit of an employee's job duties and would be protected by the First Amendment. *Id.* at 422.

Only twice since *Ceballos* have we had the opportunity to determine whether an employee's speech was pursuant to his official duties.[4] First, in *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006), we examined multiple different complaints by Freitag, a female prison guard, regarding sexual harassment by male prisoners. We held that Freitag's reports of sexual harassment, complaints to her superiors within the prison system, and documentation of the prison system's response to her complaints were all examples of unprotected speech.[5] *Id.* at 544, 546. On the other hand, with regard to her communication outside the prison system to her state senator and the appointed inspector general, "we [found] it clear that [those]

---

[4]In his dissent, Judge Fletcher also points to *Eng* and *Robinson* as cases where "we have addressed whether a government employee's speech was made pursuant to his or her official duties." Dissent, at 9354, 9356, 9357. However, neither *Eng* nor *Robinson* actually decided the scope of the plaintiff's job duties. In both, we were unable to review the question because the district court had determined that genuine issues of material fact were present and had *denied* qualified immunity. *Eng*, 552 F.3d at 1073; *Robinson*, 566 F.3d at 823-24; *see also Johnson v. Jones*, 515 U.S. 304, 319-20 (1995) (holding that appellate courts generally lack the ability to review a district court's finding of a genuine issue of fact).

[5]We remanded for additional fact-finding on the question whether pursuing a complaint all the way up the chain of command within the California Department of Corrections and Rehabilitation is within the duties of a prison guard. *Freitag*, 511 F.3d at 546.

communications [we]re protected under the First Amendment." *Id*. at 545. We held that "her right to complain both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society regardless of his status as a public employee." *Id*.

Then, in *Marable v. Nitchman*, 511 F.3d 924 (9th Cir. 2007), we concluded that a complaint by Marable, an engineer for the Washington State Ferries ("WSF"), alleging high-level corruption and mismanagement of funds was outside a ferry-worker's job duties. We applied the requisite "practical inquiry" to whether Marable's complaints concerning corrupt overpayment schemes was speech pursuant to his job duties, and found it was not. *Id*. at 932 ("Functionally . . . it cannot be disputed that his job was to do the tasks of a Chief Engineer on his ferry, and such tasks did not include pointing to corrupt actions of higher level officials whom he purportedly thought were abusing the public trust and converting public funds to their own use by overpayment schemes."). We noted that "[h]e was not responsible for attempting to ensure that his superiors abstained from allegedly corrupt financial schemes." *Id*. at 933. In total, we found four instances of Marable's protected speech: (1) complaints to the former chief executive officer of the WSF, (2) conversations with the Department of Transportation auditor, (3) a complaint to the State Executive Ethics Board, and (4) two phone calls to Nitchman, the WSF Maintenance Director. *Id*. at 929.

**[6]** Our sister circuits have also weighed in, providing additional analysis to guide our decision. First, in *Morales v. Jones*, 494 F.3d 590 (7th Cir. 2007), the Seventh Circuit held that a police officer's conversations with superiors and assistant district attorneys discussing an arrest was obviously part of the officer's duties. *Id*. at 597. On the other hand, the court concluded that being deposed as a witness in a separate § 1983 action for retaliation by the police chief against another police officer was clearly not part of an officer's job. *Id*. at 595, 598. The Fifth Circuit has determined that one indi-

cator might be whether an individual complains "up the chain of command" or instead relays "his concerns to persons outside the work place." *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008). And, the Seventh Circuit again considered the question in 2008 in *Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008). However, this time it found that the speech was not protected, because reporting misconduct and wrongdoing at a legislative hearing was part of the plaintiff's job as "an employee with significant and comprehensive responsibility for policy information and implementation." *Id.* at 1092.

**[7]** This brings us back to any statements Huppert may have made during the investigation at the Public Works yard. Huppert argues that he was not acting as a police officer during his cooperation with the District Attorney's office. Instead, he claims he was an "assistant to the District Attorney." However, in his deposition, Huppert concedes that he was asked to participate in the investigation, and subsequently assigned to do so, by the police department. While his investigative work might have been supervised by the District Attorney's office, his six-month assignment was at the direction of his superiors and, as a police officer, in his official capacity as a peace officer.

## 2

Second, both Huppert and Salgado argue they were retaliated against after they completed their investigation into improper conduct at the Pittsburg Golf Course.[6] Here they claim that their charge was to investigate corruption and gambling by PPD officers at the city golf course. Together, they produced an investigative report detailing their findings, which included information about waiver of fees for PPD employees, gambling in the golf course's sports bar by mem-

---

[6]This is the only First Amendment retaliation claim on which Salgado joins.

bers of the PPD, and other improper conduct. The report also included a list of PPD officers who took advantage of free golf. They claim this report is protected speech which ultimately led their superiors to take multiple retaliatory actions against them.

**[8]** Their argument is remarkably similar to Huppert's contention regarding the Public Works yard. As we have already noted, an investigation into corruption at a public department is most certainly a matter of public concern. The same is true for corruption within or concerning the police force. *See Thomas*, 379 F.3d at 809; *Johnson*, 48 F.3d at 425; *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983) ("the competency of the police force is surely a matter of great public concern"). However, it is more difficult to determine whether Huppert and Salgado were speaking as public employees or private citizens.

Huppert and Salgado argue that they were not acting pursuant to their job duties because, while Baker had originally assigned them to conduct the inquiry, he then ordered them to discontinue their investigation after only two interviews. However, their immediate supervisor, Hendricks, told them to continue the investigation and encouraged them to report the results. They followed Hendricks's direction and completed their investigation, which culminated in a memorandum directed to Chief Baker and the City Manager.

**[9]** This is one of the clearest examples of speech pursuant to one's job duties. Though Huppert and Salgado would have us believe that they acted outside the chain-of-command by continuing their investigation in direct contravention to Baker's demand that they cease, Hendricks ordered them to continue. Furthermore, Hendricks informed Baker that Huppert and Salgado would be probing deeper into misconduct at the Golf Course. "When [they] went to work and performed the tasks [they were] paid to perform, [Huppert and Salgado] acted as . . . government employee[s]. The fact that [their]

duties sometimes required [them] to speak or write does not mean [their] supervisors were prohibited from evaluating [their] performance." *Ceballos*, 547 U.S. at 422. Therefore, we find that Huppert and Salgado's report, created after their investigation into misconduct at the Golf Course, was also not protected speech.

## 3

**[10]** Huppert's third claim is that he was the subject of retaliatory action following his cooperation with the FBI, which began sometime in 2001. From his declaration, it appears he assisted in their investigation probing corruption at the PPD, which he claims was "outside [his] duties as a member of the PPD." In his declaration, Huppert states that he "met with Investigator Leary, Deputy District Attorney Sepulveda, and Special Agent Joe Davidson of the FBI." He claims that this communication took place entirely "on [his] personal time." This claim differs from his first two retaliation arguments because there is no evidence that he was following the direct orders of his superiors at the time he participated in the investigation. Yet, while Huppert again satisfies the first prong of the *Eng* test, he fails at the second.

The California courts have repeatedly articulated the duties of a police officer within the state. As the oft-quoted passage in *Christal v. Police Commission of City and County of San Francisco*, 92 P.2d 416, 419 (Cal. Ct. App. 1939), states:

> The duties of police officers are many and varied. Such officers are the guardians of the peace and security of the community, and the efficiency of our whole system, designed for the purpose of maintaining law and order, depends upon the extent to which such officers perform their duties and are faithful to the trust reposed in them. Among the duties of police officers are those of preventing the commission of crime, of assisting in its detection, and of disclosing

all information known to them which may lead to the apprehension and punishment of those who have transgressed our laws. When police officers acquire knowledge of facts which will tend to incriminate any person, it is their duty to disclose such facts to their superiors and to testify freely concerning such facts when called upon to do so before any duly constituted court or grand jury. It is for the performance of these duties that police officers are commissioned and paid by the community . . . .

See also Riverside County Sheriff's Dep't v. Zigman, 169 Cal. App. 4th 763, 768 (2008); Titus v. Civil Serv. Comm'n, 181 Cal. Rptr. 699, 702-03 (1982); Szmaciarz v. State Pers. Bd., 79 Cal. App. 3d 904, 915 (1978); see also Frazee v. Civil Serv. Bd. of City of Oakland, 338 P.2d 943, 945 (Cal. Ct. App. 1959).

**[11]** Though Huppert argues that he was repeatedly informed by the FBI that his investigatory work was outside his duties as a police officer, this is not enough to overcome California's jurisprudence defining such duties. It is clear that in California a police officer's official duties include investigating corruption, so as to "prevent[ ] the commission of crime, . . . [and] assist[ ]in its detection." Christal, 92 P.2d at 419. While we do not know the contents of any speech that Huppert made, we do know that such conversations with the FBI would have been to "disclos[e] all information known to [Huppert]" regarding the alleged acts of corruption within the PPD. This obviously encompasses his duty to uphold the law specifically entrusted to California's peace officers.

**4**

**[12]** Huppert's fourth and final cause of action hinges on alleged retaliation following his testimony before the county grand jury, which was also investigating corruption at the PPD. Again, under Christal and its progeny, it is manifest that

California expects such testimony from its police officers. As the California Court of Appeal made clear: "When police officers acquire knowledge of facts which will tend to incriminate any person, it is their duty to disclose such facts to their superiors and *to testify freely concerning such facts when called upon to do so before any duly constituted court or grand jury.*" *Id.* (emphasis added). Testifying before a grand jury charged with investigating corruption is one part of an officer's job. As the Supreme Court explicitly stated, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Ceballos*, 547 U.S. at 421-22; *see also Deprado v. City of Miami*, 446 F.Supp. 2d 1344, 1346 (S.D. Fla. 2006) ("In accordance with the Police Department's regulations, and the Plaintiff's obligations as a State-certified law enforcement officer, Plaintiff's subpoenaed grand jury testimony occurred pursuant to his official duties as a police officer for the City of Miami Police Department, and was not speech as a private citizen."). Therefore, any speech Huppert gave during his grand jury testimony was "pursuant to his duties as a [police officer]," and that speech is not protected by the First Amendment. *Id.* at 421.

We decline to follow the Third Circuit's decision in *Reilly v. Atlantic City*, 532 F.3d 216 (3d Cir. 2008). There, the Third Circuit considered whether a police officer's truthful trial testimony was protected speech. Reilly, an Atlantic City police officer, was called to testify for the prosecution in a trial against another police officer for allegedly running a prostitution ring and other misconduct. *Id.* at 220. Reilly had received inside information regarding the accused through his work as an investigator at the police department. *Id.* The Third Circuit found that testimony at trial was protected because "[i]t is axiomatic that 'every citizen . . . owes to his society the duty of giving testimony to aid in the enforcement of law.' " *Id.* at

228 (quoting *Piemonte v. United States*, 367 U.S. 556, 559 n.2 (1961)). Because "offering truthful testimony is the responsibility of every citizen, . . . [w]hen a government employee testifies truthfully, [he] is not simply performing his or her job duties; rather, [he] is acting as a citizen and is bound by the dictates of the court and the rules of evidence." *Id.* at 231.

The court admitted that it was answering the question of "whether truthful trial testimony *arising out of the employee's official responsibilities* constitutes protected speech." *Id.* at 230 (emphasis added). It went on to concede that "Reilly's trial testimony [ ] appears to have stemmed from his official duties in the investigation." *Id.* at 231. However, instead of finding that this was obviously speech pursuant to Reilly's job duties, the court took a swift turn to conclude that truthful testimony is never part of a police officer's duties. *Id.* This is in sharp contradiction to the Supreme Court's holding in *Ceballos*, which drew a distinct line between speech pursuant to one's job duties and speech in a private capacity. By first finding that Reilly's speech was pursuant to his job duties, but subsequently concluding that it was protected by the First Amendment, the *Reilly* court impermissibly began chipping away at the plain holding in *Ceballos*.

Judge Fletcher's dissent relies on two other cases to show that a police officer's grand jury testimony should be protected as a matter of law. The first, *Morales*, is clearly distinguishable on the facts. 494 F.3d 590. The second, *Evans v. Housing Authority of Benicia*, No. 2:07-cv-0391, 2008 WL 4177729 (E.D. Cal. 2008), is merely unbinding precedent which does not interpret the obligation of a California police officer to testify regarding crime.

First, in *Morales*, the Seventh Circuit found that "[b]eing deposed in a civil suit pursuant to a subpoena was unquestionably not one of Morales' job duties." 494 F.3d at 598. The court noted that though Morales had gained information for the civil suit while working as a police officer, and had even

testified regarding actual speech he made pursuant to his job duties, any retaliation taken because he testified in this deposition was impermissible. *Id*. This holding is understandable. Morales' statements were made in a civil suit brought by another officer against the Chief of Police and the Deputy Chief. California's courts have never said that it expects its police officers to assist other officers in their individual civil suits against present or former employers. Testimony related to the discovery and cessation of crime, however, is an obligation. That was not the question posed to the Seventh Circuit, and Judge Fletcher reads that court's holding too broadly.

Also, in *Evans*, Evans was the former accountant and bookkeeper for the Benicia Housing Authority ("BHA"), which is an "independent public agency created to provide low-cost housing to the city." 2008 WL 4177729, at *1. Evans realized that his former boss, Peterson—the then manager and Executive Director of the BHA—was operating on reduced work hours and failing to collect rent or assess late fees to delinquent tenants. *Id*, at *2. In October 2004, a grand jury was convened to investigate operations at the BHA. *Id*. Peterson first testified before the grand jury regarding overall business practices within the BHA, and then when Evans testified in late November, he explained "tenant rent account irregularities and Peterson's reduced work hours." *Id*. Following Evan's testimony, Peterson placed Evans on administrative leave and, ultimately, terminated him.

The district court held that "Evans' statements to the Grand Jury concerning the tenant rent account irregularities and Peterson's reduced working hours . . . [were] not made pursuant to Evans' official job duties." *Id*. at 7. Hence, under *Ceballos*, the statements were protected by the First Amendment and any retaliatory action taken violated Evans' constitutional rights.

In addition to the reality that *Evans* cannot and does not bind us, it is so factually distinguishable as to be irrelevant to

our discussion here. Evans was an accountant working for the city's independent housing authority. The California courts have never explicitly, or even impliedly, stated that one duty of an accountant at a public agency is to testify before grand juries. It comports with our understanding of *Ceballos* that such testimony would be outside the practical duties of a bookkeeper. However, this says nothing about whether California expects its police officers to testify about alleged criminal conduct. Judge Fletcher's reliance on this case is unavailing and unpersuasive here, merely discussed because the court chose to protect the speech of a person testifying before a grand jury. The question is not whether such testimony occurred, but instead whether the obligation to provide that testimony "owes its existence to an employee's professional responsibilities." *Ceballos*, 547 U.S. at 421.

**[13]** Our holding does not imply that a police officer might never be protected if he speaks on issues such as corruption, for we recognize that "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance." *Ceballos*, 547 U.S. at 425. Even though we find that, under California law, testimony such as Huppert's is within the duties of a police officer, speech outside one's official duties remains protected by the First Amendment. *See id.* at 422 (noting that a letter to the newspaper is similar to speech undertaken by citizens on a daily basis); *Freitag*, 468 F.3d at 545 (holding that complaints to an elected official and independent reviewing officer are outside a prison guard's work duties).

**5**

There exist other avenues of recourse available to protect an officer who exposes misconduct within the police department and is subsequently subjected to retaliation. States, including California, have created "whistle-blower" statutes for this exact purpose, and our holding today does not impact those statutes. *See, e.g.*, Cal. Gov. Code § 8547-8547.12. As

the majority in *Ceballos* explicitly stated, "[t]he dictates of sound judgment are reinforced by the powerful network of legislative enactments—such as whistle-blower protection laws and labor codes—available to those who seek to expose wrongdoing." 547 U.S. at 425.

Our conclusion today enforces these statutes and empowers a state to choose the appropriate remedy for an individual who speaks on this type of issue and is then subjected to retaliation. Further, it is these statutes that protect officers from the "Catch 22"—i.e., either not complying with a subpoena and being found in contempt of court, or testifying only to then be the subject of retaliation—that concerns Judge Fletcher. Yet, under *Ceballos*, these individuals are not entitled to the protections of the Civil Rights Act or the remedies accompanying a victorious § 1983 suit when speaking pursuant to their official duties.

**B**

In addition to his First Amendment claims, Salgado also appeals the district court's grant of summary judgment on his § 1983 claim for violations of his rights under the Fourth, Sixth, and Fourteenth Amendments. As with Huppert's claims regarding retaliation from his cooperation with the FBI, Salgado fails to identify concrete claims, bolster those claims with facts, or cite legal authority pertaining to the claims. These claims are therefore abandoned. *See* Fed. R. App. P. 28(a)(9)(A); *Xin Liu*, 347 F.3d at 1138.

**C**

Finally, Huppert and Salgado contend that the district court improperly awarded costs to the Appellees. They do not challenge the court's determination that the Appellees were the prevailing party; instead they argue that the Appellees failed to timely file their costs, rendering an award inappropriate. Local Rule section 54-1(a) states: "No later than 14 days after

entry of judgment or order under which costs may be claimed, a prevailing party claiming taxable costs must serve and file a bill of costs . . . ." While the district court issued its summary judgment ruling on November 15, 2006, the final order was not docketed until November 17, 2006. The Appellees filed their bill of costs on November 30, 2006, within the fourteen-day time period required by the Local Rules.

## IV

We affirm the district court's grant of summary judgment on all claims and the award of costs.

**AFFIRMED.**

W. FLETCHER, Circuit Judge, dissenting:

I respectfully dissent.

Former police officers Ron Huppert and Javier Salgado ("Plaintiffs") sued their former employer, the City of Pittsburg, California, and several individual members of the Pittsburg Police Department ("PPD") (collectively, "Defendants") under 42 U.S.C. § 1983 and several provisions of California law. Their § 1983 suit was primarily based on the contention that Defendants unlawfully retaliated against them for engaging in speech protected under the First Amendment. Huppert contends that he engaged in constitutionally protected speech on four occasions. Salgado contends that he engaged in constitutionally protected speech on the third of these occasions. Plaintiffs contend that Defendants unlawfully retaliated against them for this speech. The district court granted summary judgment against Plaintiffs on their First Amendment claims based on *Garcetti v. Ceballos*, 547 U.S. 410 (2006).

The majority concludes that Huppert and Salgado's speech on these four occasions was not protected under the First

Amendment. I agree with the majority with respect to Huppert's speech on the first occasion. But I disagree with the majority with respect to Huppert's speech on the second, third, and fourth occasions and Salgado's speech on the third occasion.

## I.   Factual Background

The majority opinion provides a somewhat truncated narrative of the evidence before the district court. I provide a more extended, free-standing narrative of that evidence, laying the full foundation for Huppert and Salgado's First Amendment claims. I could have made my narrative shorter by adding discrete pieces of information to supplement the majority's narrative in various places, but the result would have been choppy and awkward. My narrative is necessarily somewhat redundant, but it is intended to make the reader's ultimate task easier. My narrative relies only on evidence in the record that is properly cognizable on summary judgment.

In his sworn declaration, Plaintiff Huppert states that he joined the PPD in 1991. In 1995, when he was a patrol officer, he was assigned to work a continuous 24-hour shift at the Pittsburg Seafood Festival. He requested a modification of the shift to allow breaks during the 24-hour period. After the request was denied, he consulted a labor attorney. Without Huppert's knowledge, the attorney contacted the PPD. Defendant Aaron Baker was then a Lieutenant in the PPD. Then-Lieutenant Baker was "unhappy" with Huppert as a result of his complaint about his 24-hour shift. At Baker's direction, Huppert was presented with a letter asking him to acknowledge his sick leave abuse. Huppert refused to sign the letter and demanded to see his "sick leave slips" for the relevant period. Huppert states that the matter was then "apparently dropped."

Huppert states that in 1996, after he had been promoted to Inspector, he was assigned to investigate a vehicular man-

slaughter case. One of Huppert's supervisors, Sergeant Keeler, had been pursuing a carjacking suspect at speeds of up to 100 m.p.h. without using his siren or emergency lights. During the chase, the suspect struck and killed an innocent third person. Huppert reported his "concerns about Keeler's conduct during the pursuit." He also reported Keeler's use of "racial slurs, including 'nigger' and 'gorilla' with reference to African-Americans." Keeler was a personal friend of Baker. Now a Commander, Baker charged Huppert with misconduct for not having previously reported Keeler's use of racial slurs and sent him a "warning" letter. (In his sworn declaration, Baker calls it a "letter of advisement.") Huppert states that even though Keeler's use of racial slurs was verified by another officer, Baker concluded that Huppert's report was "unfounded."

Huppert states that in 1997 and 1998, he was selected by the Contra Costa County District Attorney to assist with an investigation into corruption at the public works yard. "From that time on, my superiors treated me with scorn and as an outcast."

Huppert states that in 1998 he took the sergeant's exam. He finished first on the written portion. During the oral portion of the exam, he was questioned "mostly" about his goatee. He was not promoted to sergeant. The day after the oral examination, Baker told him that he had been passed over because of the goatee.

Huppert states that sometime prior to 2001 he began cooperating with the FBI in an investigation of corruption in the PPD. Huppert characterizes this cooperation as being "outside [his] duties as a member of the PPD." Defendant Baker had been promoted to Chief of Police in September 1998. Huppert states that Baker learned of his cooperation with the FBI and in 2001 had him transferred from Investigations to Code Enforcement. Commander William Hendricks was in charge of this unit. Hendricks states in his sworn declaration that the

Code Enforcement unit "was known as the 'Penal Colony' because disaffected and/or disfavored officers were assigned there." He states, "Chief Aaron Baker expressly ordered me to terminate plaintiff Huppert or force him to take a position outside the Department; then-Lieutenant William Zbacnik was present during this conversation." Huppert states in his declaration that Hendricks told him that Baker had "told him to see that I left or find a way to fire me."

Huppert states that Defendant Zbacnik told him that he was not allowed to work overtime for the six-month period between January and June 2001. Huppert was physically transferred from the newly rebuilt Pittsburg Civic Center to a building where the "Penal Colony" worked. Huppert's office in the Penal Colony was a "tiny converted bathroom without computer access." Even though Huppert was assigned to investigate gangs, the Penal Colony building did not have "a secured area that a Gang and Intelligence office would need."

Plaintiff Salgado states in his sworn declaration that in September 2001 he was assigned to the Code Enforcement unit and became Huppert's partner. Both Huppert and Salgado state that the City Manager then asked them to "investigate possible corruption at the City-owned golf course." They state that Baker told them not to inform their superior, Hendricks, of the investigation. Their investigation "revealed improper conduct by members of the PPD, including gambling, accepting free golf, and possible illegal drug activity." Hendricks states in his declaration that after two interviews and only one day of investigating, Baker ordered Huppert and Salgado to stop the investigation.

Hendricks states, "I tried to protect [Huppert and Salgado] from any retaliation. I went to the FBI with what I believed to be a major gambling operation, and told Baker that I had referred the matter to the FBI. I learned from my discussions with Chief Baker and others that Zbacnik, Lt. Robert Gomez, and other people under Zbacnik's command were involved in

illegal activity at the Golf Course. I told Baker that he may be violating the law by trying to bury the investigation by Huppert and Salgado. Baker threatened me with my career if I continued to press the matter."

Huppert states that he and Salgado continued to investigate "with the knowledge and encouragement of Hendricks." Hendricks states that Baker ordered them not to write a report, but Huppert states that he nonetheless reported their "initial findings" in an " 'abridged' memo." Huppert states that his report included "a finding that defendant Zbacnik had accepted thousands of dollars in gratuities and other illegal perks." However, Baker took "no action" against Zbacnik," calling Zbacnik's actions a " 'training issue.' " Huppert states that he and Salgado informed only Baker and the City Manager of their findings. However, he stated that Ray Giacamelli, a member of the PPD and a personal friend of Zbacnik, told Huppert and Salgado that "we were sticking our noses where they did not belong and that we were 'going to go down.' " Huppert and Salgado reported the threat to Baker, but Baker said that "no investigation was warranted."

Huppert and Salgado state that in May 2002 the Code and Enforcement unit was moved back to the main Civic Center building. They were not given an office initially, but were eventually assigned one in "an old storage room."

Huppert states that in December 2002, Hendricks was "forced out." Defendant Michael Barbanica became the new supervisor of their unit. In January 2003, Barbanica and Defendant William "Brian" Addington falsely accused Huppert and Salgado of having engaged in an improper pursuit. Huppert and Salgado state that neither of them had been involved in the pursuit in question. Barbanica initially said that an " 'anonymous concerned citizen' " had called to complain about Huppert and Salgado's alleged pursuit, but Barbanica later admitted that he had made this up.

Huppert and Salgado state that in late 2003 and early 2004 their supervisor was Sergeant Reposa. When Reposa was absent, neither Huppert nor Salgado was permitted to serve as acting supervisor, even though that would have been the normal practice. Huppert and Salgado were thereby denied the opportunity to earn "out-of-class pay."

Huppert and Salgado state that in February 2004, Defendant Wayne Derby became their supervisor. Derby informed them that he was Baker's " 'hatchet man' " and that Baker saw them as "malcontents." Derby took away the unmarked undercover car that Salgado had previously driven and replaced it with a Ford Taurus that, while unmarked, was "easily recognizable as a police vehicle." Driving the Taurus "hindered" Huppert and Salgado's "ability to function as gang detectives."

Huppert states that in March 2004 he was subpoenaed to testify before a civil grand jury that was "probing corruption in the PPD." Huppert had been contacted about the probe several years earlier by Senior Investigator Tom Leary of the Contra Costa County District Attorney's Office. On what he describes as his "personal time," Huppert had met with Leary, Deputy District Attorney Sepulveda, and FBI Special Agent Joe Davidson. Huppert states that Davidson told him that his "actions in connection with the probe were as an individual and not in my capacity as a member of the PPD." Grand jury subpoenas were delivered to the PPD for service on about a dozen individual officers. Huppert was served with his subpoena in front of other PPD officers, and the subpoena was recorded in a log posted in the break room. Huppert states that Baker told him that he knew he had testified before the grand jury. However, Baker states in his declaration that "I was not aware that Huppert ever testified before the Grand Jury regarding these issues." Baker states further, "I have never been informed of the substance of such testimony by Huppert."

Huppert states that after he testified before the grand jury, Defendant Derby informed him that his position as gang investigator was being "eliminated." Huppert was transferred to the Investigations unit where his supervisor was Defendant Addington. Although detectives junior to Huppert were assigned to "person crimes," Huppert was assigned to fraud, which was regarded as a less desirable assignment. After Huppert was assigned to fraud, Addington changed the procedure so that all fraud cases originating with the Patrol Bureau came to Huppert. Previously, fraud cases originating with the Patrol Bureau could be closed at that level. Under the new procedure, Huppert was required to close those cases and to write reports for all of them. Huppert states that the change was a "purposeless increase in workload intended to harass me."

Huppert states that Addington engaged in numerous acts to make his work life difficult. For example, he sent reports back to Huppert "because of 'flaws' such as the letter 'M' (for 'Male') being in the wrong font"; he refused to allow Huppert to wear a uniform shirt with an out-of-date embroidered badge when other officers were permitted to do so; and he told Huppert to come see him because he had his " 'pink slip,' " and then said he was kidding. Further, Addington attempted to replace a "superlative" yearly evaluation of Huppert by Sergeant Stroup that was already in his personnel file with an evaluation of his own, even though Addington had not been Huppert's supervisor at the time in question. After Huppert and the Patrol Officers' Association filed a grievance against the PPD and Addington, Baker restored Stroup's evaluation to Huppert's file.

Beginning in April 2005, Huppert retired on disability due to a knee injury. He states in his declaration that elective surgery on his knee "might" have enabled him to return to active police work. "However, given the persistent and pervasive discrimination and harassment I suffered, the fact that my long-time partner, Salgado, was terminated after he began his

association with me, and the other means by which the defendants in this action sought to destroy my career and the careers of other good officers, I accepted the disability retirement and elected not to undergo surgery." (In the district court, Huppert claimed racial discrimination in violation of state law, and his reference to "discrimination" in the just-quoted sentence is a reference to that claim. Huppert has not appealed the district court's summary judgment ruling on his state-law discrimination claim.)

Salgado states that in late 2003 and early 2004, Addington began investigating PPD Officer Jim Hartley for alleged falsification of reports. It was "apparent" to Salgado that "Addington disliked Hartley and was seeking to terminate him." Addington attempted to persuade Salgado to "claim first-hand knowledge of incidents I had not witnessed." Salgado refused.

Salgado states that in May 2004 he was placed on administrative leave pending an investigation into whether he had falsified reports in California Health and Safety Code § 11550 ("driving under the influence") cases. Salgado states in his declaration that he "did 'cut and paste' when writing such reports," but that this was "an accepted practice at the time in the PPD." He states that "the individual test results for each suspect were accurately recorded." Salgado states further that "cutting and pasting . . . was actually encouraged by some supervisors." "On several occasions defendants Barbanica and Addington asked me to provide officers with one of my pre-formatted reports, and during the investigation of my reports I saw reports written by officers Raman, Albanese, and Wentz using my template. . . . A number of the questioned reports that led to my termination were in fact reviewed and approved by defendants Addington and Barbanica, both of whom were also present at some of the arrests in question."

Salgado states that in July 2004 he was given a Notice of Proposed Disciplinary Action proposing his termination from the PPD. Two days before his scheduled hearing under *Skelly*

*v. State Personnel Board*, 15 Cal. 3d 194 (1975), Salgado received a telephone call from a newspaper reporter who told him that Baker was planning to terminate him and that the District Attorney would bring a criminal prosecution. A newspaper article to that effect appeared on the day scheduled for the hearing. On advice of counsel, Salgado did not appear. Baker, performing as Acting City Manager, terminated Salgado's employment three days later. Shortly thereafter, Baker reinstated Salgado. Defendant Barbanica then informed Salgado that if he resigned, all criminal charges would be dropped. Salgado learned, however, that his personnel file was being "purged of all positive references." Salgado looked at his file and discovered that all of his good performance reviews had been removed, including his 2001 Officer of the Year award. Salgado did not resign and was formally terminated in late August 2004.

Defendant Addington testified in his deposition that one of the two Deputy District Attorneys to whom he spoke was reluctant to file criminal charges against Salgado. Addington testified that after he made "my own pitch" to the Deputy criminal charges were filed. Salgado pleaded no contest to five felony counts of falsifying reports in violation of California Penal Code § 118.5.

Except as noted during the course of the foregoing narrative, Defendants do not contest the factual accuracy of Huppert, Salgado, and Hendricks' sworn declarations.

## II.　Legal Background

For nearly four decades, we determined whether a public employee's speech was protected under the First Amendment by following the analysis in *Pickering v. Board of Education*, 391 U.S. 563 (1968). In *Pickering*, a public school teacher had sent a letter to the editor of the local newspaper criticizing the board of education and superintendent of schools for their handling of school funding. *See id.* at 564. The teacher was

fired in retaliation for the letter. He brought suit, claiming that the First Amendment protected his speech. The Supreme Court agreed, stating that speech deserves First Amendment protection when it addresses "a matter of legitimate public concern." *Id.* at 571.

The Supreme Court's recent decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), has made it more difficult for government employees to establish that their speech is protected under the First Amendment. Ceballos, a deputy district attorney, concluded that an affidavit used to obtain a search warrant in a pending criminal case contained "serious misrepresentations." *Id.* at 414. He stated this in a "disposition memorandum" to his supervisors, who allegedly retaliated against him because of the memorandum. *Id.* at 414-15. Ceballos brought suit under § 1983, claiming that his speech was protected under the First Amendment. The Court disagreed, holding that "when public employees make statements pursuant to their official duties, the . . . First Amendment . . . does not insulate their communications from employer discipline. Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do." *Id.* at 421.

The Court wrote that "the parties in this case do not dispute that Ceballos wrote his disposition memo pursuant to his employment duties. We thus have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Id.* at 424. However, the Court did provide a few guidelines. It explicitly rejected the "suggestion that employers can restrict employees' rights by creating excessively broad job descriptions." *Id.* Rather, the Court stated that "[t]he proper inquiry is a practical one[,]" as "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." *Id.* at 424-25. The Court also noted that speaking in the workplace, rather than in public, does not necessarily mean that the speech was made pursuant

to official duties. *See id.* at 420-21. Furthermore, whether the speech concerns "the subject matter of [the speaker's] employment . . . is nondispositive." *Id.* at 421.

In four cases decided after *Ceballos*, we have addressed whether a government employee's speech was made pursuant to his or her official duties. The first case is *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006), in which Freitag, a correctional officer at Pelican Bay Prison, complained that inmates were sexually harassing her and undermining her ability to impose discipline by repeatedly masturbating in front of her. Freitag first complained to her supervisors about the sexual harassment. She complained to them again after they repeatedly refused to take disciplinary action against the offending prisoners. For example, one of Freitag's supervisors threw away the form on which she had reported masturbation, saying that she was the only person who had a problem with this inmate and that "it's only sex." *Id.* at 533.

When Freitag's immediate supervisors continued to ignore and belittle her complaints, she wrote to the head of the California prison system, the Director of the California Department of Corrections and Rehabilitation ("CDCR"). After her supervisors retaliated against her for having written to the Director, Freitag contacted a state senator and California's Office of the Inspector General ("Inspector General"), an independent agency that oversees the CDCR. Freitag's supervisors further retaliated against her for having contacted the state senator and the Inspector General.

We were unsure, based on the record before us, whether Freitag's letter to the Director of the CDCR was protected speech under the First Amendment. We remanded for a factual determination of the scope of Freitag's "official duties," stating that "[w]e are unsure whether prison guards are expected to air complaints . . . all the way up to the Director." *Id.* at 546. However, we were certain that Freitag had not spoken "pursuant to [her] official duties," and that she was pro-

tected by the First Amendment, when she contacted the state senator and the Inspector General. *Id.* at 545. We wrote:

> Freitag acted as a citizen when she wrote letters to Senator Polanco and communicated with the Inspector General regarding her complaints of sexual harassment. Her right to complain both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society regardless of his status as a public employee. Under *Ceballos*, Freitag does not lose her right to speak as a citizen simply because she initiated the communications while at work or because they concerned the subject matter of her employment.

*Id.* (citations omitted); *see also Fuerst v. Clarke*, 454 F.3d 770 (7th Cir. 2006) (holding that plaintiff deputy sheriff's adverse comments on the sheriff's decision to hire a public relations officer were not made pursuant to his official duties).

The second case is *Marable v. Nitchman*, 511 F.3d 924 (9th Cir. 2007), in which Marable, a Chief Engineer in charge of the engine department of a ferry operated by the Washington State Ferries ("WSF"), complained of corrupt financial practices by WSF managers. He complained in two telephone calls to the Maintenance Director of the WSF; in two conversations with a Washington Department of Transportation auditor; in a conversation with a former CEO of the WSF; and in a complaint to the Washington Executive Ethics Board. *See id.* at 929. Marable's superiors retaliated against him for having made these complaints.

We held that Marable's complaints were protected by the First Amendment. We wrote:

> At the outset, we think it worth noting that an employee's charge of high level corruption in a government agency has all of the hallmarks that we nor-

mally associate with constitutionally protected speech. The matter challenged was a matter of intense public interest, had it become known, and criticisms of a government lie at or near the core of what the First Amendment aims to protect.

*Id.* at 932. We concluded that Marable's speech, including his speech within the WSF hierarchy, was protected because it was not made pursuant to his official duties:

> The Supreme Court has observed that the inquiry into whether employee speech is pursuant to employment duties is a practical one. . . . Functionally, . . . it cannot be disputed that [Marable's] job was to do the tasks of a Chief Engineer on his ferry, and such tasks did not include pointing to corrupt actions of higher level officials whom he purportedly thought were abusing the public trust and converting public funds to their own use by overpayment schemes.

*Id.*

   The third case is *Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009), in which Eng, a Los Angeles County Deputy District Attorney, presented a report to his supervisors recommending that no criminal charges be brought against persons involved in the planning and construction of the local school district's Belmont Learning Complex. 552 F.3d at 1064. Eng's report conflicted with the report of Anthony Patchett, the leader of the Belmont Task Force, and with the political agenda of Eng's boss, the recently-elected District Attorney, who had campaigned on a promise to reform the Belmont project. *Id.* The Task Force adopted Eng's report. *Id.* At the meeting of the Task Force adopting his report, Eng argued that the financing for the Belmont project fell through because Patchett "had improperly leaked to the IRS that the School District had committed fraud in purchasing the Belmont

property." *Id.* Thereafter, Eng's supervisors purportedly retaliated against him by falsely accusing him of sexual harassment and suspending him for improper use of an office computer, a trumped up charge. Id. at 1065-66. The *Los Angeles Times* later published an article on Eng's case that included statements from Mark Geragos, Eng's attorney. *Id.* at 1065.

In reviewing Eng's First Amendment retaliation claim, we stated that " 'the question of the scope and content of a plaintiff 's job responsibilities is a question of fact.' " *Id.* at 1071 (citation omitted). "In evaluating whether a plaintiff spoke as a private citizen, we must therefore assume the truth of the facts as alleged by the plaintiff with respect to employment responsibilities." *Id.* We concluded that while Eng had a duty to submit his report, "Eng's version of the facts plausibly indicates that he had no official duty to complain about [Patchett's] leak to the IRS or to authorize Geragos to speak to the press." *Id.* at 1073. We held that Eng properly stated a First Amendment retaliation claim. *Id.* at 1074.

The fourth case is *Robinson v. York*, 566 F.3d 817 (9th Cir. 2009). Robinson, a sergeant in the Los Angeles County Office of Public Safety, testified in a class action lawsuit alleging discrimination by his employer and filed several misconduct reports pertaining to problematic behavior, some of which he observed while off duty. *Id*. at 820-21. The reports described, for example, officers who appeared to be consuming alcohol while on duty and instances of potential battery or excessive force. *Id.* Robinson alleged that his supervisors discouraged him from filing so many reports and indicated that filing fewer reports would improve his chances of being promoted to lieutenant. *Id.* at 821. Robinson thereafter performed very well on an examination for promotion to lieutenant but was not promoted. *Id.* He filed suit under the First Amendment. *Id.*

In determining whether Robinson's reports were filed pursuant to his official duties, we stated that the "scope of Robin-

son's duties is a question of fact. [W]hen there are genuine
and material disputes as to the scope and content of the plain-
tiff's job responsibilities, the court must reserve judgment . . .
until after the fact finding process. " *Id.* at 823-24 (internal
quotation marks and citations omitted; bracket and ellipses in
original). We concluded that we must "assume the resolution
of this dispute in the non-moving party's favor." *Id.* at 824
(citing *Eng*, 552 F.3d at 1067).

The lesson from the Supreme Court's decision in *Ceballos,*
and from the four cases we have decided since then, is clear.
If a public employee's speech is made pursuant to his or her
official duties, it is not protected under the First Amendment.
However, if there is a genuine issue of material fact as to
whether speech was made pursuant to a plaintiff's official
duties, that issue may not be treated as a question of law to
be resolved at summary judgment. Rather, it must be treated
as a question of fact to be resolved in a fact-finding proceed-
ing.

In *Freitag*, we were uncertain whether Freitag had a duty
to report her complaints to the Director of the CDCR. 468
F.3d at 546. Rather than deciding the scope of Freitag's duties
as a question of law, we remanded for a factual determination.
*Id.* It was only because there was no dispute that Freitag's
speech to a state senator and the Inspector General was not
made pursuant to her official duties that we did not require a
factual determination on that issue. Likewise, in *Marable* it
was only because the speech by Marable to high level offi-
cials regarding corruption in his department indisputably fell
outside of his duties as an engineer on a ferry that we did not
require a factual determination on that issue. The plaintiff in
*Eng* "plausibly" did not have a duty to complain about his co-
worker's leak to the IRS or to authorize his lawyer to speak
to the press. 552 F.3d at 1073. That was enough to survive
summary judgment and to require a factual determination at
trial. Finally, because the duties of the plaintiff in *Robinson*
were disputed, we permitted the First Amendment claim to

proceed, stating that we "must reserve judgment . . . until *after* the fact finding process." 566 F.3d at 824 (emphasis added, internal quotation marks omitted, ellipsis in original).

Requiring factual determinations by a jury, or by a judge after a bench trial, when there is a genuine factual dispute about the scope of a plaintiff's official duties makes sense as a matter of institutional competence. In many instances, a judge can have only an imperfect understanding of the precise duties associated with a public sector job when all he or she knows is a job title. The duties of jobs with the same title often vary substantially depending on the agency and job location. The duties associated with a particular job may change over time. And the actual duties of an employee may vary substantially from the formal, publicly released job description. Thus, for a judge to conclude as a matter of law what is, and is not, included in a public employee's official duties is a very hazardous enterprise.

## III.  Plaintiffs' Protected Speech

Plaintiffs contend that they engaged in protected speech on four occasions: (1) Huppert's speech during his investigation into corruption at the public works yard in 1997 and 1998; (2) Huppert's speech during his cooperation with the FBI in its investigation into corruption in the police department sometime prior to 2001; (3) Huppert and Salgado's speech during their investigation into police corruption at the city-owned golf course beginning in late 2001; and (4) Huppert's subpoenaed speech to the grand jury in 2004 during its investigation into corruption in the police department.

I agree with the majority that the district court's summary judgment with respect to Huppert's speech on the first occasion should be affirmed. In my view, Huppert has provided insufficient evidence that his speech on that occasion was not uttered pursuant to his official duties to survive summary judgment.

However, I disagree with the majority with respect to Huppert's speech on the second, third, and fourth occasions, and with respect to Salgado's speech on the third occasion. In my view, there is a genuine issue of material fact whether Plaintiffs' speech on the second and third occasions was uttered pursuant to their official duties and, therefore, whether it was protected under the First Amendment. Further, in my view, Huppert's speech on the fourth occasion was protected, as a matter of law, under the First Amendment.

### A.    Huppert's Speech During the FBI Investigation into Corruption in the Pittsburg Police Department

Huppert states in his declaration that sometime prior to 2001 he began cooperating with the FBI in its investigation of corruption in the Pittsburg Police Department ("PPD"). Huppert specifically states that his cooperation was "outside [his] duties as a member of the PPD." Huppert states that in 2001, when Police Chief Baker learned of his cooperation with the FBI, he retaliated by transferring Huppert to the Code Enforcement unit of the PPD, otherwise known as the Penal Colony.

In my view, Huppert has created a genuine issue of material fact as to the scope of his official duties. Huppert has specifically, and not implausibly, stated that his speech during his cooperation with the FBI's investigation into corruption in the PPD was not part of his official duties as a member of the PPD. I therefore conclude that the scope of Huppert's official duties, and the motivation for Baker's assignment of Huppert to the Penal Colony, are questions of fact to be resolved by a jury, not an issue of law to be resolved on summary judgment.

### B.    Huppert and Salgado's Speech During the Investigation into Police Corruption at the City-Owned Golf Course

Huppert and Salgado state in their declarations that the City Manager asked them to conduct the investigation into police

corruption at the city-owned golf course. Commander Hendricks, states in his declaration that Police Chief Baker told Huppert and Salgado to stop their investigation after only one day. Hendricks states that Baker explicitly ordered Huppert and Salgado not to write a report. Huppert states that, in direct disobedience to Baker's order, he and Salgado continued their investigation and that he wrote a report of their "initial findings." Huppert and Salgado state that they were retaliated against for this speech.

Huppert and Salgado contend that because they continued their investigation, and because Huppert wrote the report in direct contravention of orders from Police Chief Baker, the speech contained in the report was not made pursuant to their official duties. I recognize that Huppert and Salgado continued their investigation with the knowledge and encouragement of Commander Hendricks. But any encouragement from Hendricks conflicted with the direct order of Police Chief Baker. In my view, a direct order from the Chief of Police is a more authoritative source for determining the scope of a police officer's official duties than the encouragement of a lower-ranking officer in the department to disobey that order. At most, Hendricks' encouragement of Huppert and Salgado creates a factual question as to the scope of their official duties. This is precisely the type of question that we saved for fact-finding proceedings in *Freitag*, *Eng*, and *Robinson*. Huppert and Salgado's version of the facts "plausibly indicates that [they] had no official duty" to prepare the report on their public golf course corruption investigation. *Eng*, 552 F.3d at 1073. Consequently, we must "assume the resolution of this dispute in the non-moving part[ies'] favor." *Robinson*, 2009 U.S. App. LEXIS 8844 at *11.

Police Chief Baker, who is a defendant in this suit, may be able to provide evidence that would help a jury determine the scope of Huppert and Salgado's official duties. For example, Baker could testify that in directing them not to prepare the report, he was defining the contours of their official duties. If

this is so, Huppert was not acting pursuant to his official duties when he wrote the report, and his (and Salgado's) speech is protected under the First Amendment. On the other hand, Baker could testify that writing the report was part of their official duties, and that Baker was directing them not to perform their duty. If this is so, Baker may have been behaving improperly by attempting to cover up corruption in his police force, but Huppert and Salgado were acting pursuant to their official duties in preparing the report, and their speech was not protected.

### C.　Subpoenaed Testimony Before the Grand Jury Investigating Corruption in the Pittsburg Police Department

Huppert was subpoenaed to appear before a civil grand jury investigating corruption in the Pittsburg Police Department. He appeared before the grand jury in compliance with the subpoena. We do not know his actual testimony, but we know that he testified concerning corruption in the PPD. Huppert states that after he testified he was subjected to various retaliatory actions.

The majority relies on *Christal v. Police Commission of San Francisco*, 92 P.2d 416, 419 (Cal. Ct. App. 1939), to conclude that police officers in California have an official duty to testify pursuant to a subpoena before grand juries investigating corruption in their department. *Christal* states, "When police officers acquire knowledge of facts which will tend to incriminate any person, it is their duty to disclose such facts to their superiors and to testify freely concerning such facts when called upon to do so before any duly constituted court or grand jury." I do not regard *Christal* as relevant to the question before us. In my view, if a public employee is subpoenaed to testify before a grand jury, he or she has a duty as a citizen that is independent of any duty he or she might also have as an employee. In testifying pursuant to a subpoena, the

employee is therefore not performing an official duty within the meaning of *Ceballos*.

The majority's conclusion that Huppert's subpoenaed speech before the grand jury is not protected under the First Amendment conflicts with two recent decisions by our sister circuits. *In Morales v. Jones*, 494 F.3d 590 (7th Cir. 2007), Milwaukee police officer Morales testified in a deposition pursuant to a subpoena. The substance of his testimony concerned evidence that the Chief and Deputy Chief of Police had harbored a fugitive, the brother of the Deputy Chief, and that the Chief had retaliated against another officer in another matter. Morales claimed in a § 1983 suit that the Chief of Police and the Deputy Chief retaliated against him for his deposition testimony. The Seventh Circuit held that Morales' speech during the deposition was protected under the First Amendment. The court wrote,

> Being deposed in a civil suit pursuant to a subpoena was unquestionably not one of Morales' job duties because it was not part of what he was employed to do. Nonetheless, Morales testified about speech he made pursuant to his official duties and we must determine whether that fact renders his deposition unprotected. We hold that it does not. . . .

*Id.* at 598.

In *Reilly v. Atlantic City*, 532 F.3d 216, 220 (3d Cir. 2008), Atlantic City police officer Reilly testified in a criminal trial against a fellow officer accused of corruption. A high-ranking Atlantic City police officer who was a friend of the allegedly corrupt officer had been a suspect but had not been charged. Reilly claimed in a § 1983 suit that the Chief of Police and the high-ranking officer retaliated against him for his trial testimony. The Third Circuit held that Reilly's testimony was protected under the First Amendment. The court wrote:

> [T]he act of offering truthful testimony is the respon-
> sibility of every citizen, and the First Amendment
> protection associated with fulfilling that duty of citi-
> zenship is not vitiated by one's status as a public
> employee. That an employee's official responsibili-
> ties provided the initial impetus to appear in court is
> immaterial to his/her independent obligation as a cit-
> izen to testify truthfully.

*Id.* at 231.

A recent district court decision in our own circuit is even
more directly on point. In *Evans v. Housing Authority of Beni-
cia*, 2008 WL 4177729 (E.D. Cal. Sept. 8, 2008), Evans was
an accountant for the Benicia Housing Authority ("BHA").
Evans observed that Peterson, one of his supervisors, was
working "reduced hours" and was not collecting certain past
due rents. Evans reported his observations to the Chairperson
of the BHA. He later testified about his observations before
a civil grand jury investigating the BHA.

The court held that Evans' testimony before the grand jury
was protected, both as to the hours worked by Peterson and
to her failure to collect rents. The court wrote:

> Testifying before the Grand Jury was not in any way
> part of Evans' official job duties. It was clearly not
> within the scope of Evans' official job duties to tes-
> tify before the Grand Jury about Peterson's alleged
> failure to collect past due rents . . . . Nor was it
> within the scope of Evans's duties to testify before
> the Grand Jury about Peterson's reduced work hours.
> Rather, it was Evans' duty as a citizen to expose
> such official malfeasance to broader scrutiny.

*Id. But see Deprado v. City of Miami*, 446 F. Supp. 2d 1344,
1346 (S.D. Fla. 2006) (holding that "[i]n accordance with the
[Miami] Police Department's regulations, and the Plaintiff's

obligations as a State-certified law enforcement officer," grand jury testimony by a Miami police officer was not protected speech under the First Amendment).

*Morales*, *Reilly*, and *Evans* hold that where there is an independent legal duty to speak (in our case, to testify before the grand jury pursuant to a subpoena), the employee has First Amendment protection for truthful speech uttered in performance of that independent legal duty. The fact that the employer may require its employees to obey a law that exists independent of the employment relationship does not allow the employer to retaliate against an employee for obeying that law.

This holding comports with sound policy. There are strong reasons to avoid holding that police officers have an official duty, within the meaning of *Ceballos*, to testify before a grand jury pursuant to a subpoena about corruption among their fellow officers. Such a holding would result in a Catch 22. If a police officer were subpoenaed to testify, he or she would have two choices. One choice would be to testify before the grand jury. In that event, the officer could lawfully be fired in retaliation for his or her testimony. The other choice would be to refuse to testify. In that event, the officer would face contempt (and possibly other adverse consequences) for failing to comply with a subpoena.

The subject of Huppert's testimony before the grand jury was, in the words of our decision in *Marable*, "high level corruption in a government agency," which "has all the hallmarks that we normally associate with constitutionally protected speech." 511 F.3d at 932. When he appeared before the grand jury, Huppert acted "as a citizen," exercising a right "guaranteed to any citizen in a democratic society regardless of his status as a public employee." *Freitag*, 468 F.3d at 545. He also appeared pursuant to his duty as a citizen, independent from his duty as a public employee, to comply with the subpoena. That Huppert's speech concerned "the subject mat-

ter of [his] employment . . . is nondispositive." *Ceballos*, 547 U.S. at 421. Sound policy counsels us not to conclude that his speech was made pursuant to his official duties. So do *Morales* and *Reilly*, the only opinions by courts of appeals on this issue. I think we are fully justified in following these cases and holding that when an officer testifies before a grand jury pursuant to a subpoena concerning corruption of his or her fellow officers, the officer is not performing an official duty within the meaning of *Ceballos*.

## Conclusion

The majority holds that Huppert's speech during the FBI investigation into corruption in the Pittsburg Police Department, and Huppert and Salgado's speech during the investigation into police corruption at the city-owned golf course, were not protected under the First Amendment. In so holding, the majority fails to follow our binding circuit precedent in four cases decided after the Supreme Court's decision in *Ceballos* — *Freitag*, *Marable*, *Eng*, and *Robinson*.

The majority also holds that Huppert's subpoenaed speech to the grand jury investigating corruption in the Pittsburg Police Department was not protected by the First Amendment. In so holding, the majority creates a circuit split with the Seventh Circuit's decision in *Morales* and the Third Circuit's decision in *Reilly*.

I respectfully dissent.