**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KEN MARABLE, the senior Chief
Engineer of The Washington State
Ferries and a married man and his
marital community,
            *Plaintiff-Appellant,*

            v.

MARK NITCHMAN, former Director
of Preservation and Maintenance
of the Washington State Ferries;
DOUGLAS MACDONALD, Director of
the Washington State Department
of Transportation; RICHARD D.
PHILLIPS, a Staff Chief of the
Washington State Ferries,
            *Defendants-Appellees.*

No. 06-35940

D.C. No.
CV-05-01270-MJP

OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
September 24, 2007—Seattle, Washington

Filed December 26, 2007

Before: Betty Binns Fletcher, Andrew J. Kleinfeld, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould

16731

## COUNSEL

Shawn Hart, for the plaintiff-appellant (argued and on the brief).

Catherine Hendricks, Senior Counsel, Seattle, Washington, for the defendants-appellees (argued and on the brief). Robert

M. McKenna, Attorney General, State of Washington, for the defendants-appellees (on the brief).

---

**OPINION**

GOULD, Circuit Judge:

Plaintiff Ken Marable appeals the district court's grant of a motion for summary judgment in favor of the defendants, with resulting dismissal of Marable's case. Marable appeals the district court's summary judgment dismissing his claims for damages and injunctive relief to "protect [his] rights . . . under the U.S. Constitution": 1) a 42 U.S.C. § 1983 claim alleging violation of his First Amendment rights as applicable to the states by way of the Fourteenth Amendment; 2) a 42 U.S.C. § 1983 claim alleging violation of his Fourteenth Amendment rights to procedural due process; 3) a Washington state law claim of negligent infliction of emotional distress; and 4) a Washington state statutory claim for whistleblower retaliation.[1] We have jurisdiction pursuant to 28 U.S.C. § 1291. We address in this opinion only Marable's First Amendment claim for damages, and on this First Amendment claim we reverse and remand to the district court for further proceedings consistent with this opinion.[2]

**I**

Marable is an engineer for the Washington State Ferries ("WSF") with more than thirty years of experience. In his complaint he alleged that in recent years he had observed and

---

[1]Marable also brought a fifth claim, namely for breach of contract under Washington state law, but he does not appeal the district court's grant of summary judgment on that claim.

[2]Marable's other three appealed claims, as well as his claim for injunctive relief, are the subject of a separate, unpublished memorandum disposition filed contemporaneously with this opinion.

reported corrupt practices among members of WSF management, including the defendants, and that the defendants retaliated against him for speaking out against corruption.

In 1999 Marable began work aboard the WSF ferry MV Puyallup. Defendant and Staff Chief Engineer Doug Phillips, to whom Marable was directly responsible, selected Marable as the ferry's Alternate State Chief Engineer, a position from which Marable was in full charge of the engine department.[3] As WSF Maintenance Director, defendant Mark Nitchman ranked higher than both Phillips and Marable. In 2002 WSF instituted disciplinary actions against Marable.

According to the defendants, shortly after Marable's selection as Chief Engineer, Marable engaged in misconduct,[4] which constituted acts of insubordination and grounds for discipline, up to and including employment termination. On November 13, 2002, Nitchman wrote Marable of misconduct charges that Phillips made against Marable, advising Marable that such charges, if proven, might warrant termination and

---

[3]According to the WSF Human Resources Safety and Training Manual, a Chief Engineer "is in full charge of the Engine Department of a ferry of any class carrying vehicles and passengers on Puget Sound waters. . . ." The Chief is directly responsible to the Staff Chief Engineer and must assume whatever responsibilities that Staff Chief Engineer may assign. The Chief Engineer is "responsible for implementing all federal and state regulations, WSF policies and procedures, and Staff Chief Engineer . . . directives that relate to his/her vessel." The duties include "ensuring that all machinery aboard a [WSF] vessel, both mechanical and electrical, . . . is properly maintained and serviced."

[4]Marable was accused of: violating multiple of Phillips' standing orders, including failing to contact Phillips regarding important vessel-related events, some of which required notification of the U.S. Coast Guard or WSF Port Engineers; refusing to "run the stern tube lube pumps" during his watch without a written order from Phillips; criminally recording telephone conversations on the ship's cellular phone in violation of R.C.W. §§ 9.73.030 and 9.73.080; and writing comments in the ship's official engine room log book that Phillips viewed as discourteous, insubordinate and undermining his authority.

that a pre-disciplinary meeting (or a "*Loudermill*" hearing) was set for December 19, 2002, at which Marable was entitled to union or legal representation.

At Marable's *Loudermill* hearing, over which Nitchman presided, Marable was represented by both his personal lawyer and union counsel. Marable did not object to Nitchman's presiding role at this hearing. Nitchman found Marable guilty of the alleged misconduct warranting termination, but given Marable's long WSF employment record without similar misconduct, Marable was not terminated but instead received a week's suspension without pay and was barred from being Chief Engineer for a year. Marable neither filed a grievance relating to Nitchman's ruling, as the union contract allowed, nor appealed to the Marine Employees Commission.[5]

Marable asserts that this disciplinary action was taken not because of misconduct by him but rather in retaliation for his complaints about the corrupt practices of WSF management. Marable had alleged that WSF managers, including the defendants, participated in such schemes as claiming inappropriate overtime and using WSF "Special Projects" to enable them to supplement their pay inappropriately.[6] Marable argues that these alleged forms of "pay padding" are a waste of public funds and a threat to public safety. Additionally, Marable points out that on July 18, 2002, a few months before Marable received Nitchman's letter asserting disciplinary charges, the

---

[5]Marable asserts that his union refused to represent or support him in an appeal to the Marine Employees Commission because of the conflict of interest created by the control of the union by management including Nitchman and Phillips.

[6]One "pay padding" scheme that Marable alleges involved WSF employees who purportedly failed to make entries in the ferry logbooks so that on-duty ferry workers would have to call them at home to get the needed information, allowing the off-site employees to log overtime hours for these calls. Marable also claims generally that some managers participated in corrupt *quid pro quo* arrangements, including the taking of unlawful kickbacks.

Washington State Auditor had written Nitchman to inform him that his department, which included oversight of engineering room and maintenance budgets, was under investigation. Marable implies that this audit investigation was a cause for retaliation, though Marable does not say how Nitchman would have connected the audit to Marable, and the record does not establish that any of Marable's complaints instigated the investigation.

Marable further asserts that, also in retaliation for his criticism of WSF corruption, he was exposed to a product known as Oil Eater 99 that WSF used on its ferries.[7] Marable contends that he had submitted paperwork to the WSF in January 2001, notifying management that he was allergic to the substance and requesting its removal from his ferry. Marable contends further that Nitchman caused the cleaner to be placed aboard Marable's ferry in retaliation for Marable's criticisms of Special Projects.[8]

Marable claims that he repeatedly attempted to remove Oil Eater 99 from the ferry, that Phillips repeatedly reordered it, that Marable continued to exhibit an allergic reaction when exposed to the substance, and that finally an external office called to order Oil Eater's removal from the ferry altogether. Marable asserts, with a witness's support, that Phillips once stated something to Marable similar to, "I have [Oil Eater 99], I will use it, and you will be gone."

Finally, Marable claims that a union representative informed him in January of 2005, shortly after Marable had submitted a declaration in support of another whistleblower case against Nitchman, that Nitchman had discussed firing

---

[7] Oil Eater 99 is a heavy duty surfactant degreaser with the lowest hazard health rating of all WSF-purchased products and is purported to be not only the best degreaser for the WSF system but also safe for use.

[8] A toxicologist testified for the defendants that WSF's response to Marable's allergic reaction was appropriate.

Marable with the representative. Both Phillips and Nitchman deny that any retaliatory motive underlies any of the alleged actions.

Against this alleged background, Marable sued Nitchman and Phillips on five counts, four of which remain on appeal before us. We address in this opinion Marable's claim against the defendants in their individual capacities under 42 U.S.C. § 1983, asserting that Nitchman and Phillips violated his free speech rights under the First Amendment, applied to the states by way of the Fourteenth Amendment, by retaliating against him for criticizing their alleged corrupt and wasteful practices. Marable seeks damages from Nitchman and Phillips, in their individual capacities, and injunctive relief from defendants in their official capacities against future violations of his constitutional rights.

The defendants filed motions for summary judgment, seeking to dispose of all claims against them. The district court granted defendants' motion for summary judgment denying injunctive relief. The district court, noting that Oil Eater 99 has been removed from Marable's workplace and that most alleged events took place more than four years ago, concluded that Marable did not demonstrate a likely threat of future injury and was therefore barred from injunctive relief.

As to Marable's First Amendment claim, the district court at first denied defendants' motion for summary judgment. The district court held that Marable's speech referred to issues of public resources and safety and was of public concern. The district court also, relying upon the U.S. Supreme Court case *Garcetti v. Ceballos*, 126 S.Ct. 1951 (2005), concluded that Marable's complaints of misconduct were not assigned duties of WSF engineers and therefore were afforded First Amendment protection. Finally, the district court noted the existence of conflicts of fact about whether the alleged protected speech was a motivating factor in the disciplinary action. But thereafter the district court held a jury instruction conference, for

which it had requested and reviewed supplemental briefing. The district court also heard oral argument, and then issued an order reversing course on Marable's First Amendment claim and granting summary judgment for defendants, dismissing Marable's entire case.[9] In its dismissal order, the district court reviewed each example that Marable provided of specific protected speech: Marable's complaints about Special Projects to former WSF CEO Mike Thorne, his two conversations with Department of Transportation auditor Jeri Silvertson, his complaint to the State Executive Ethics Board, and his two phone calls to Nitchman.

In light of our recent precedent of *Freitag v. Ayers*, 468 F.3d 528 (2006), the district court concluded that Marable's communications with Thorne and Nitchman constituted on-the-job speech rather than speech as a citizen and was therefore not protected by the First Amendment. The court also held that Marable's conversation with the State Executive Ethics Board was similarly not protected because it fell within Marable's job duties, as well as because it was not adequately of "public concern" under the test of *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). Finally, the district court rejected Marable's contention that his conversations with Jeri Silvertson were protected because Marable had proffered insufficient evidence for the court to decide the matter. Marable appeals the summary judgment against his First Amendment claim, and we reverse.

---

[9]Defendants assert that the lower court's dismissal of Marable's First Amendment claims was largely because Marable did not identify specific examples of protected speech. Without these examples it would be impossible for the court to draft "a protected speech instruction without identifying what the speech is that the jury is told to protect." The district court's dismissal order states that Marable was unable to provide the trial court with a specific complaint he had made to Nitchman or anyone else on the subject of pay padding. During the jury instruction conference, the district court commented that "it is a failure of proof on the plaintiff's part that keeps me from making the basic analysis of whether this is First Amendment speech that is in the public interest."

**II**

We review *de novo* the district court's decision on cross motions for summary judgment. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 426 F.3d 1162, 1172 n.11 (9th Cir. 2005) (en banc). We consider, viewing the evidence in the light most favorable to the nonmoving party, whether there are genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003). We do not weigh the evidence but only determine whether there is a genuine issue for trial. *Abdul-Jabbar v. Gen. Motor Corp.*, 85 F.3d 407, 410 (9th Cir. 1996).

**III**

**[1]** Public employees suffer a constitutional violation when they are wrongfully terminated or disciplined for making protected speech. *See Pickering*, 391 U.S. at 563. To state a First Amendment claim against a public employer, an employee must show: 1) the employee engaged in constitutionally protected speech; 2) the employer took "adverse employment action" against the employee; and 3) the employee's speech was a "substantial or motivating" factor for the adverse action. *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (citing *Bd. of County Comm'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 675 (1996). Significantly, to qualify as "protected speech" under the first element, the employee must have uttered the speech as a citizen, not an employee; as the Supreme Court recently clarified, when public employees make statements pursuant to their official duties, those statements do not receive First Amendment protection. *Ceballos*, 126 S.Ct. at 1955-56.

**[2]** Marable doubtless suffered adverse employment action and thus meets the second element of the *Coszalter* test; his employer accused him of misconduct, conducted a disciplin-

ary hearing, and suspended him without pay. This is about as adverse as it gets.

Also, as the district court noted in its first order on Marable's First Amendment claim, there are triable issues of fact regarding whether the alleged protected speech was a motivating factor in the disciplinary action, i.e., whether Marable meets *Coszalter*'s third element.[10] To support his retaliation claim, Marable points to the temporal proximity between his alleged protected speech and the retaliatory conduct. The defendants, by contrast, contend that they had no knowledge of such alleged speech until after seeking to discipline Marable and that they had separate and distinct material grounds for disciplining Marable. Because we must at this stage view the evidence in the light most favorable to Marable as the nonmoving party, we conclude that there remains a genuine issue of material fact on the causation element, the third element of the *Coszalter* test, mandating resolution of the First Amendment claim by a jury if Marable is able to satisfy the summary judgment threshold on the first element, that of whether Marable engaged in constitutionally protected speech, and it is to that issue that we now turn.

"The inquiry into the protected status of speech is one of law, not fact." *Connick v. Myers*, 461 U.S. 138, 148 n. 7 (1983) (internal citations omitted). In its first order on Marable's First Amendment claim, the district court concluded that Marable's speech referred to issues of public resources and safety and therefore was of public concern, and that it was not a part of the assigned duties of WSF engineers; thus the district court concluded that the speech was constitutionally protected. However, in its subsequent order, the district court changed its view, based on an interpretation of our recent

---

[10]It is Marable's burden to show that his constitutionally protected speech was a motivating factor in WSF's adverse employment action. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

decision in *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006), denying the majority of Marable's speech the constitutional protection that Marable seeks.[11] The district court reasoned that *Freitag* requires the conclusion that most of Marable's speech was pursuant to his official duties, and therefore not protected.

We disagree with the district court's conclusion. We will discuss at some length how we see *Ceballos* and *Freitag*, as related to this case.

In *Ceballos*, plaintiff Richard Ceballos was a calendar deputy in the Los Angeles County District Attorney's Office, where he had certain supervisory responsibilities over other lawyers. *Ceballos*, 126 S.Ct. at 1955. After a defense attorney asked Ceballos to investigate a pending criminal case and alleged inaccuracies in an affidavit used to obtain a critical search warrant in that case, Ceballos researched the matter and concluded that the affidavit contained serious misrepresentations.[12] *Id*. Ceballos wrote a disposition memorandum to his superiors, recommending that the case be dismissed. *Id*. at 1955-56. Ceballos's supervisors proceeded with the case despite his recommendations, and at a subsequent hearing, the

---

[11]The district court did not err procedurally in revisiting its previous denial of defendants' summary judgment motion on claim one. The discretionary law of the case doctrine—generally providing that a court will not reconsider an issue decided explicitly or by necessary implication by the same or a higher court in the identical case, *Jeffries v. Wood*, 114 F.3d 1484, 1489 (9th Cir. 1997)—is inapplicable where intervening controlling authority makes reconsideration appropriate. *Id.* Because our intervening opinion in *Freitag* clarified how the relevant Supreme Court case of *Ceballos* should apply to facts involving similar employee invocation of First Amendment protection for speech complaining internally of workplace misconduct, the district court properly reconsidered its previous denial of summary judgment.

[12]According to Ceballos, it was not unusual for defense attorneys to ask calendar deputies to investigate aspects of pending cases. *Ceballos*, 126 S.Ct. at 1955.

defense called Ceballos to recount his observations about the affidavit. *Id.* at 1956.

When he was reassigned, transferred, and denied a promotion, Ceballos sued his employer and supervisors, alleging that they violated his First Amendment rights in retaliation for his disposition memorandum. *Id.* Ceballos's case presented the Supreme Court with the question whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties. The Supreme Court held that Ceballos's speech did not qualify as "protected speech" because it was made as an employee, not a citizen; as all parties agreed in Ceballos's case, he prepared his disposition memorandum as part of his official duties. *Id.* at 1960. Where the employee speaks pursuant to official duties, the speech is not protected. *Id.*

In *Freitag*, Deanna Freitag, a former correctional officer for the California Department of Corrections and Rehabilitation (CDCR), had sued several CDCR administrators, claiming that they had retaliated against her for engaging in constitutionally protected speech in violation of 42 U.S.C. § 1983. *Freitag*, 468 F.3d at 532. During her tenure at CDCR, Freitag had had numerous encounters with inmates engaging in sexual exhibitionist behavior. *Id.* at 533-34. In response, Freitag had submitted both disciplinary reports and documents called 128 Forms to detail the incidents for the inmates' files, and in multiple instances she recommended and/or requested that the offending inmate receive discipline. *Id.* CDCR officials had repeatedly discarded the 128 Forms she submitted and had denied her requests for discipline. Freitag next complained to her prison's warden that her reports of inmate misbehavior were being denied or thrown away, undermining Freitag's authority and discretion. *Id.* at 533. She wrote more letters to an associate warden, to the warden again, and to the director of the CDCR, all complaining about her supervisors' responses to the alleged incidents of misconduct, and the resulting hostile work environment; recommending enforce-

ment of CDCR policy referring repeat offenders to the district attorney's office for prosecution; and requesting that her prison's officers receive additional training on how to manage inmates with behavioral problems. *Id*. at 533-34. Freitag further complained to a California State Senator, who contacted the California Office of the Inspector General (IG) to initiate an investigation. *Id.* at 535. The IG then interviewed Freitag, among others, in its investigation. *Id*.

Having subsequently suffered various adverse employment actions that were undisputably substantially motivated by these communications, Freitag brought her First Amendment claim. Applying the Supreme Court's recent decision in *Ceballos*, we held that Freitag's communications with the California State Senator and the IG were clearly protected under the First Amendment. *Id*. at 545. We concluded that Freitag had acted as a citizen in complaining to an elected public official and an independent state agency on these matters of public concern. *Id*. at 545-46.

However, as to the internal forms Freitag prepared, on the other hand, we concluded that Freitag had submitted those reports pursuant to her official correctional officer duties, and therefore those communications were not constitutionally protected. *Id*. at 546. Specifically, we held that "[r]eporting sexually hostile inmate conduct to agents of the [CDCR], either formally or informally" and "[d]ocumenting [ . . . her p]rison's responses or failures to respond to Plaintiff's reports of sexually hostile inmate conduct" were a part of Freitag's official duties. *Id*. at 544, 546. Regarding Freitag's letter to the CDCR director, we remanded to the district court for a determination of whether prison guards are expected to air their complaints regarding prison conditions all the way up to the CDCR director. *Id*.

The district court erred in concluding that *Freitag* mandates the holding that Marable's speech was pursuant to his official duties. At the outset, we think it worth noting that an employ-

ee's charge of high level corruption in a government agency has all of the hallmarks that we normally associate with constitutionally protected speech. The matter challenged was a matter of intense public interest, had it become known, and criticisms of the government lie at or near the core of what the First Amendment aims to protect. Also, turning back to *Freitag*, the conclusion that Freitag's preparation of internal forms was pursuant to her official duties, was not reached merely because these forms were internal. *See Ceballos*, 126 S. Ct. at 1959 ("That Ceballos expressed his views inside his office, rather than publicly, is not dispositive."). Nor were they part of her official duties merely because they concerned the subject matter of her employment. *See id.* (noting that subject matter of employment is nondispositive). That Freitag complained about conduct of her superiors in and of itself was neither necessary nor sufficient to our conclusion that Freitag's acts were official duties.

Instead, and critically, in *Freitag* the plaintiff as a correctional officer was required as a part of her official duties to report inmate misconduct and to pursue appropriate discipline. *See id.* at 534 (discussing CDCR's policy of referring repeat offenders to the district attorney's office for prosecution). The misconduct revealed in Freitag's communications —and which Freitag alleged that her supervisors mishandled —concerned inmates that her position as a correctional officer required her to supervise and discipline. Thus her critique of inmates was a part of the "work . . . [s]he was paid to perform." *Id.* at 544 (quoting *Ceballos*, 126 S. Ct. at 1960). Her complaints to her prison's administration, including its warden, stated that her reports of inmate misbehavior were being thrown away, thus causing her "authority and discretion [to be] undermined," *id.* at 533; stated another way, her supervisors' actions were preventing her from effectively doing her job, and her complaints about being ignored by them were directly related to her job duties.

[3] By contrast, in Marable's case, his complaints concerning his superiors' allegedly corrupt overpayment schemes

were not in any way a part of his official job duties. The Supreme Court has observed that the inquiry into whether employee speech is pursuant to employment duties is a practical one. *Ceballos*, 126 S. Ct. at 1962 ("[T]he listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for *First Amendment* purposes.") Thus Marable's formal job description is perhaps not dispositive. Functionally, however, it cannot be disputed that his job was to do the tasks of a Chief Engineer on his ferry, and such tasks did not include pointing to corrupt actions of higher level officials whom he purportedly thought were abusing the public trust and converting public funds to their own use by overpayment schemes.

**[4]** Making the practical inquiry on Marable's job duties, which we think is required by the Supreme Court's reasoning, we conclude that Marable had no official duty to ensure that his supervisors were refraining from the alleged corrupt practices. While the WSF Human Resources Safety and Training Manual's description is not dispositive, it is informative. As a Chief Engineer for WSF, Marable was "in full charge of [his ferry's] Engine Department . . . ." His official duties all related to "ensuring that all machinery aboard [his] vessel, both mechanical and electrical, . . . [wa]s properly maintained and serviced"; *i.e.*, he was responsible for ensuring that his ferry's physical machinery functioned properly and safely. He was *not* responsible for attempting to ensure that his superiors abstained from allegedly corrupt financial schemes.[13] Unlike in Freitag where the plaintiff's communications about her

---

[13]Defendants rely in part on broad language in the WSF training manuals to argue a different conclusion. However, as suggested, the mere fact that the WSF's official Chief Engineer manual includes catch-all provisions such as that Marable, as a Chief Engineer, "[k]now and enforce all applicable federal and state rules and regulations" does little to inform our analysis. As the Supreme Court stated in *Ceballos*—in which there was no question but that the plaintiff's internal memorandum was pursuant to his

supervisors' actions directly concerned and were pursuant to her role as a correctional officer overseeing inmates, Marable's official duties did not extend so far as to encompass the communications at issue.

## IV

We reverse the district court's holding that Marable's job duties foreclosed any of his proffered instances of protected speech from the First Amendment's protection. We remand Marable's First Amendment claim to the district court for further proceedings consistent with this opinion, including a resolution of the remaining triable issues of fact surrounding whether Marable's communications were a motivating factor in the adverse employment actions that Marable endured.

**REVERSED AND REMANDED.**

---

official duties, *Ceballos*, 126 S. Ct. at 1960— "[w]e reject . . . the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions. The proper inquiry is a practical one [into] . . . the duties an employee actually is expected to perform . . . ." *Id.* at 1961-62 (internal citations omitted). Additionally, defendants urge us to conclude that the relevant speech falls within Marable's official duties because of the communications' purported links to safety issues. However, defendants' argument is unconvincing because Marable's duties as Chief Engineer in charge of the engine room only concerned safety insofar as he was required to ensure the safe operation of the ferry's mechanical systems.